# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CLARA JORDAN, on behalf of
decedent CHARLES JORDAN,

              *Plaintiff,*

           v.

BECTON, DICKINSON AND
COMPANY, a New Jersey company,

              *Defendant.*

Case No.

**PLAINTIFF DEMANDS TRIAL BY JURY**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Clara Jordan, on behalf of decedent Charles Jordan brings this Complaint and Demand for Jury Trial against Defendant Becton, Dickinson and Company ("BD") for the harm BD caused to Decedent as a result of its emissions of toxic ethylene oxide into the community.[1] Plaintiff alleges as follows upon personal knowledge as to Decedent and Decedent's acts and experiences, and, as to all other matters upon information and belief.

---

[1] Plaintiff originally filed this action with two other plaintiffs in the case captioned *Jordan, et al. v. Becton, Dickinson and Company, et al.*, 1:2021-cv-03759 (N.D. Ga.). Pursuant to the Court's Order regarding severance of each plaintiff's claims, *id.*, Dkt. 30, Plaintiff is refiling this separate case as a single-plaintiff complaint, which will relate back to the originally filed *Jordan* action.

**INTRODUCTION**

1.      Becton, Dickinson and Company operates an industrial medical sterilization plant in Covington, Georgia. As part of its sterilization process, BD uses and emits ethylene oxide ("EtO").

2.      While ethylene oxide has been recognized as a hazardous air pollutant since 1991, classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since, at least, the mid-1980s, BD disregarded ethylene oxide's harmful properties and continues to release it into the surrounding community—entirely unbeknownst (until very recently) to area residents and workers.

3.      Self-reported emission estimates from the BD facility indicate high levels of ethylene oxide release. BD has released as much as 101,755 pounds of ethylene oxide in a single year. While a portion of BD's EtO emissions is emitted through controlled and monitored points, the largest amount of these emission estimates are uncontrolled "fugitive emissions" that have been escaping, and continue to escape, the BD facility.

4.      Air monitoring tests around the BD facility show ethylene oxide levels in excess of the U.S. Environmental Protection Agency's ("U.S. EPA") acceptable cancer risk and in excess of Georgia's Acceptable Ambient Concentration ("AAC")

levels for EtO. Most concerning is that air monitoring showed high levels of EtO around residential areas in Covington.

5.     As a result, and unbeknownst to them, individuals living and working near the BD facility face some of the highest long-term cancer risks in the United States. These individuals have been unknowingly inhaling ethylene oxide on a routine and continuous basis for decades. Now they are suffering from a variety of cancers, reproductive issues, birth defects, and other life-altering health effects from their continuous exposure to ethylene oxide.

## PARTIES

6.     Plaintiff Clara Jordan is a natural person and citizen of the State of Georgia.

7.     Defendant Becton, Dickinson and Company is a corporation organized and existing under the laws of New Jersey with its principal place of business located at 1 Becton Drive, Franklin Lakes, New Jersey 07417.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because (i) the parties are citizens of different states, (ii) and the amount in controversy exceeds $75,000.

3

9.     This Court has personal jurisdiction over Defendant because it is registered to do business in this District and carries on a continuous and systematic part of its business throughout this District.

10.     Venue is proper because Defendant operates a facility in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     Brief Overview of the Ethylene Oxide Industry

11.     Ethylene oxide is an odorless and colorless flammable gas at room temperature that is produced in large volumes for industrial uses.

12.     Commercial medical equipment sterilizers use ethylene oxide in their sterilization processes for over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate from the equipment. While EtO's gaseous form has

industrial uses, like medical device sterilization, the average person does not use EtO for such uses.

13.     Since at least 1987, Defendant BD has used, and continues to use, EtO in its industrial medical device sterilization process.

14.     Throughout the industrial process described above, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e., smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

15.     As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades, all while BD knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

II.     **Health Effects of Ethylene Oxide Exposure**

16.     Ethylene oxide is an odorless, colorless gas that is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

17.    In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of ethylene oxide.

18.    In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with the increase of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased number of leukemia and other cancers.

19.    The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of ethylene oxide and the petrochemical industry at large. Indeed, NIOSH requested that producers, distributors, and users of EtO further disseminate the bulletin and inform others of the chemical's dangers: "[o]n the basis of this information, NIOSH requests that producers, distributors, and users of ethylene oxide, and of substances and materials

6

containing ethylene oxide, give this information to their workers and customers, and that professional and trade associations and unions inform their members."

20.    In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

21.    In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

22.    As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's highest risk classification, finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the EPA's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by thirty (30) times. Critically, these classifications are not

limited to the workplace: EtO is carcinogenic and harmful to those who ingest it even if they don't work with it on a regular basis. The draft December 2020 Toxicological Profile for Ethylene Oxide submitted for public comment by the Agency for Toxic Substances and Disease Registry, for example, recognizes that those living near facilities that use EtO may face elevated concentrations because of emissions or accidental releases. Indeed, as described below, it is precisely because EtO is carcinogenic regardless of circumstance that it is recognized as a toxic air pollutant whose emissions must be tracked and its release into the atmosphere (and consequential exposure to nearby properties) limited.

23.    Exposure to ethylene oxide has been widely studied and its negative health effects well documented. Presently, there is evidence linking ethylene oxide exposure to an increased risk of lymphohematopoietic cancers, such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, the uterus, and the brain; and reproductive and developmental impairments, including an increased rate of miscarriages and infertility.

24.    Most recently, the Illinois Department of Public Health ("IDPH") assessed cancer rates in the population surrounding the Sterigenics facility in Willowbrook, Illinois, which has been using and emitting EtO in its industrial

sterilization process since 1984. The findings reaffirm the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;

- Pediatric lymphoma;

- Breast cancer;

- Prostate cancer;

- Pancreatic cancer;

- Ovarian cancer; and

- Bladder cancer.

25.    Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. EPA states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

## III.    Defendant Knew That EtO Emissions Were Harmful

26.    By the early 1980s, ethylene oxide's negative health effects were widely disseminated to industrial users and emitters of the chemical. This means that, during the time BD operated its facility it knew or should have known that ethylene oxide is and was always dangerous to human health and that its emissions posed (and continue to pose) a serious risk to area residents.

27.     In October 1985 the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's cacogenic health effects. In this Notice, the U.S. EPA also stated that it performed a dispersion model to estimate the concentration levels which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional forty-seven (47) cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least several hours, a sufficient length of time for a significant human exposure to occur."

28.     In July 1986, when considering adding "ethylene oxide (EO) to the list of hazardous air pollutants" the U.S. EPA issued a letter to ethylene oxide users requesting "information about E[t]O sterilization processes, E[t]O emission levels from sterilizers, and emission controls on E[t]O sterilizers at each of your facilities that uses E[t]O for sterilization or fumigation." This request came in light of the NIOSH study showing evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and the U.S. EPA's concern with "significant quantities of EO [being emitted] to the atmosphere" and, consequently, affecting individuals

10

living and working near ethylene oxide facilities. The U.S. EPA sent the July 1986

letter to various EtO users and emitters, including one of BD' subsidiaries.

Ultimately, ethylene oxide was included on the original list of hazardous air

pollutants identified in the 1990 Amendment to the Clean Air Act.

29.     The BD facility's EtO emissions were a concern since at least 1986.

For instance, a 1986 U.S. EPA report states that the BD facility in Covington was

among the largest sterilizers "with about eight sterilizer units that are current

uncontrolled." The report emphasized that "Georgia is asking for retrofit control on

all of the sterilizer units, claiming that [BD's] emission are about 100 times the

acceptable limit."

30.     By 1990 then, ethylene oxide users and emitters were aware of the

dangers of the chemical and legal consequences of emissions. Indeed, in 1990

California Attorney General Van de Kamp brought a lawsuit against four emitters

of ethylene oxide alleging that the EtO emitters had exposed an estimated 3 million

people living near emissions sites to the potent carcinogen.

31.     BD, however, continued to emit large quantities of ethylene oxide (as

discussed below) notwithstanding these known dangers and the highly publicized

enforcement actions brought by Attorneys General.

**IV.   Defendant Emits Harmful Levels of Ethylene Oxide**

a.      **The U.S. EPA Estimates High Risks of Cancer Near BD's Facility**

32.      On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA")—a screening tool that estimated cancer risks based on emission data in 76,727 census tracts across the United States.

33.      The 2014 NATA revealed 109 census tracts in the United States with cancer risk scores greater than 100 cases per one million people exposed to toxic air pollution during their lifetime, more than what the U.S. EPA considers "acceptable" limits. One of these tracts surrounds the BD facility in Covington, Georgia; nine other tracts surrounding the facility had elevated cancer risks:

- Tract 13217100300: **214 per million**;

- Tract 13217100201: 60 per million;

- Tract 13217100600: 52 per million;

- Tract 13217100502: 52 per million;

- Tract 13217100700: 63 per million;

- Tract 13217100100: 62 per million;

- Tract 13297110602: 52 per million;

- Tract 13297110800: 53 per million;

- Tract 13217100202: 75 per million;

- Tract 13211010200: 51 per million;

34.     Despite having only one census track with cancer risks above 100 per million, the U.S. EPA "considers any exposure, however small, to a carcinogen to create some cancer risk."

35.     The U.S. EPA estimates the lifetime risk of developing cancer due to air toxics in one of these tracts near the BD facility to be up to *ten times higher* than the average national cancer risk across the U.S. population. Fewer than one percent of the census tracts in the U.S. have an estimated cancer risk due to air toxics that measures up to the cancer risk of the tracts surrounding the BD facility, with cancer risk scores greater than or equal to 100 per one million.

**b.     The U.S. EPA's Cancer Risks are Understated**

36.     While the 2014 NATA reveals higher than acceptable cancer risks in the areas around the BD facility, these risks are understated.

37.     The U.S. EPA warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate emission sources and potential public health risks. It notes several NATA shortcomings such as the lack of direct measurements of pollutants and data gaps.

38.     Most importantly, the 2014 NATA is a model created on the assumed exposure of a facility's reported 2014 emissions. But the emissions from BD have historically been higher than its reported emissions in 2014.

39.    The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals that pose a threat to human health and the environment.

40.    A review of TRI data from the U.S. EPA shows EtO emissions from the BD facility over the course of more than twenty years. *See* <u>Figures 1-3</u>.



(**<u>Figure 1</u>**, showing ethylene oxide emissions between 1987 and 1991)



(**<u>Figure 2</u>**, showing ethylene oxide emissions between 1992 and 2018)

| Year | Fugitive Emissions (in lbs) | Stack Emissions (in lbs) |
|---|---|---|
| 1987 | 6,846 | 68,460 |
| 1988 | 10,233 | 86,630 |
| 1989 | 11,473 | 90,282 |
| 1990 | 13,066 | 73,971 |
| 1991 | 1,700 | 34,000 |
| 1992 | 103 | 12,558 |
| 1993 | 1,258 | 3,651 |
| 1994 | 1,521 | 4,415 |
| 1995 | 8,250 | 5,163 |
| 1996 | 8,745 | 3,823 |
| 1997 | 8,886 | 1,876 |
| 1998 | 14,024 | 2,619 |
| 1999 | 14,269 | 2,709 |
| 2000 | 13,395 | 2,390 |
| 2001 | 13,134 | 2,295 |
| 2002 | 14,710 | 2,274 |
| 2003 | 17,274 | 2,932 |
| 2004 | 6,164 | 3,218 |
| 2005 | 6,527 | 3,404 |
| 2006 | 6,637 | 3,455 |
| 2007 | 6,028 | 3,179 |
| 2008 | 2,009 | 2,933 |
| 2009 | 2,168 | 3,093 |
| 2010 | 2,224 | 3,093 |
| 2011 | 2,387 | 3,340 |
| 2012 | 2,536 | 3,533 |
| 2013 | 2,845 | 3,984 |
| 2014 | 580 | 111 |
| 2015 | 649 | 122 |
| 2016 | 612 | 114 |
| 2017 | 555 | 101 |
| 2018 | 555 | 100 |

(**Figure 3**)

15

41.   From 2004 to 2013, BD has consistently emitted between approximately 4,900 and 10,000 pounds of carcinogenic ethylene oxide from its facility. And, from 1995 to 2003, emitted between 10,700 and 20,200 pounds of EtO. These reported emissions, however, are overshadowed by BD's emission in previous years, but were not accounted for in the 2014 NATA Report. For example, in 1987 BD emitted over 75,300 pounds of EtO; over 96,800 pounds in 1988; over 101,700 pounds in 1989; and over 87,000 pounds in 1990.

42.   A significant portion of BD's emissions include fugitive emissions from leaking valves and other equipment. These emissions are only based on estimates due to their elusive nature. Between 1997 and 2007, BD's fugitive emissions were greater than its controlled emissions and in 2003 they reached 5.9 times the controlled emissions. *See* Figure 3.

43.   BD's recent and widely publicized September 2019 ethylene oxide leak serves as an example of the facility's fugitive emissions. Indeed, from September 17, 2019 through September 22, 2019, BD reported an eight-day EtO leak from its facility. The reported source of the leak was an unclosed exhaust valve.

44.   The overall design of its facility and the lack of training BD employees received partially contributed to the facility's fugitive emissions. The city of Covington released an incident report stating that the valve at issue at the BD facility

16

"has no indication to visually determine if it is in the fully closed position." It was not until after the incident, that BD planned to conduct training and educate its technicians on how to properly operate the type of valve that had been involved in the leak.

45.     Indeed, Attorney General of Georgia Chris Carr stated that the BD leak was caused by "a lack of diligence and prolonged operator error rather than an equipment malfunction."[2]

46.     As a result of BD's emissions of carcinogenic ethylene oxide into the air and the surrounding communities, people living and working in the surrounding communities have been unknowingly exposed to elevated concentrations of EtO.

**c.     The Georgia Environmental Protection Division's Air Modeling**

47.     According to the Georgia Environmental Protection Division's ("GA EPD") air modeling, the BD facility exceeds Georgia's annual Acceptable Ambient Concentration for ethylene oxide.

48.     The AAC is the maximum allowable air concentration of a toxic air pollutant like ethylene oxide. The GA EPD calculated the annual AAC for ethylene

---

[2]     OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF GEORGIA, Archived Releases, Oct. 21, 2019, https://law.georgia.gov/press-releases/2019-10-21/carr-epd-file-complaint-against-bd-violations-georgia-law-and-rules.

oxide at 0.00033 µg/m$^3$ based on the U.S. EPA's Integrated Risk Information System ("IRIS") and the Inhalation Unit Risk ("IUR") for EtO.

49.     On June 7, 2019, the GA EPD published its air dispersion modeling of ethylene oxide in the areas surrounding the BD facility in Covington, Georgia. The GA EPD relied on emissions rates provided by BD and discrete receptors placed along the facility's property boundaries.

50.     The GA EPD's modeling revealed a maximum ground level concentration ("MGLC")—the concentration of a pollutant to which a human is normally exposed—in excess of the AAC. Specifically, the GA EPD found that the highest annual concentration of ethylene oxide in the previous five years around the facility was 0.163 µg/m$^3$—over 493 times the AAC.

51.     The GA EPD also modeled the ethylene oxide levels in residential areas next to the BD facility. It registered a MGLC of ethylene oxide between 0.008 µg/m$^3$ and 0.032 µg/m$^3$ or between twenty-three (23) and ninety-seven (97) times the annual AAC for ethylene oxide.

52.     The averaged five-year MGLC—designed to assess EtO impact over a longer period of time—also exceeded the AAC levels. Specifically, it registered an annual MGLC of 0.144 µg/m$^3$. In residential areas, the averaged five-year MGLC

levels registered between 0.006 $\mu g/m^3$ and 0.028 $\mu g/m^3$ or between seventeen (17) and eighty-four (84) times the annual AAC for ethylene oxide.

53. The GA EPD concluded that "ethylene oxide concentrations at the nearby residential areas are well above the AAC level."

**d.  Air Monitoring Results**

54. Ethylene oxide air monitoring test results show high levels of ethylene oxide in areas around the BD facility and communities in Covington, Georgia. Unsurprisingly, these real-world measurements show higher air concentrations of ethylene oxide in the communities around BD than the GA EPD's air modeling.

55. The city of Covington conducted its own air monitoring tests for seven consecutive days in September 2019 by placing air cannisters in areas around the BD facility.

56. Several the air cannisters registered the presence of ethylene oxide in high concentrations reaching as high as 15.3 $\mu g/m^3$ in an area adjected to the BD facility—significantly higher that the GA EPD's initial air modeling. Indeed, that concentration is 765 times higher than the U.S. EPA's acceptable limit[3] and over 46,363 times the AAC for ethylene oxide exposure.

---

[3] For reference, the U.S. EPA associates a concentration of ethylene oxide of 0.02 $\mu g/m^3$ with a 100-in-a-million cancer risk for a lifetime of continuous exposure.

57.    In a residential neighborhood adjacent to BD's facility, a cannister registered EtO levels from nondetectable up to 13.8 $\mu g/m^3$. That concentration level corresponds with an EtO concentration that is 690 times the U.S. EPA's level of concern.

58.    On October 30, 2019, BD voluntarily shut down its facility until it addresses fugitive emissions from its facility and installs pollution control equipment.

**FACTS SPECIFIC TO PLAINTIFF JORDAN**

59.    Plaintiff Clara Jordan's decedent, Charles Jordan, lived in Covington for the majority of his life.

60.    Between 1970 and 2017, Charles lived less than half a mile from the BD facility.

61.    Charles consistently inhaled contaminated air in and around his home, and in the Covington area.

62.    As a result, Charles was diagnosed with brain cancer and lung cancer in February of 2017 and passed away in December of 2017.

63.    At the time of his diagnoses, neither Clara nor Charles had notice that Charles' medical conditions were wrongfully caused or that they were caused by the Defendant's emissions of ethylene oxide.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and Against Defendant)**

64.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65.     At all times relevant, Defendant owed a duty to exercise reasonable care in the operation of its facilities, including the emission of EtO.

66.     Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

      a.     Emitting dangerous volumes of EtO into the air from its facilities;

      b.     Disregarding safe methods to adequately control EtO emissions from its facilities;

      c.     Failing to control and report fugitive emissions of EtO;

      d.     Failing to comply with Georgia's limits on EtO concentrations;

      e.     Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

      f.     Subjecting those who live and work nearby its facility to an elevated cancer risk.

67.     As a proximate result of one of the aforesaid negligent acts or omissions, Decedent suffered injuries of a personal and pecuniary nature.

**COUNT II**

**Willful and Wanton Misconduct**
**(On Behalf of Plaintiff and Against Defendant)**

68.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

69.     At all times relevant, Defendant owed a duty to refrain from willful and wanton misconduct and/or conduct which exhibited an indifference and/or conscious disregard to the health, safety, and well-being of Decedent and those living and working in the area surrounding Defendant's facility.

70.     Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

    a.     Emitting dangerous volumes of EtO into the air from its facilities;

    b.     Disregarding safe methods to adequately control EtO emissions from its facilities;

    c.     Failing to comply with Georgia's limits on EtO concentrations;

    d.     Failing to control and report fugitive emissions of EtO;

    e.     Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

    f.     Subjecting those who live and work nearby its facility to an elevated cancer risk.

71.     Defendant acted in a way that shows a conscious disregard for the known dangers its EtO posed to its neighbors. As explained in Paragraphs ¶¶ 19–34,

BD knew of the specific dangers associated with EtO exposure, knew of the regulatory regime built up around it because it was so noxious, but nevertheless emitted thousands of pounds of it into the air around Decedent's home. And in fact, it emitted even greater quantities of EtO in the years after the U.S. EPA warned of dramatically elevated cancer risks in the areas surrounding BD's facility. And, of course, despite being in a position of superior knowledge with regard to these facts, Defendant did not warn Decedent of the risks that he faced to contract the illness he was ultimately diagnosed with.

72.     Making matters worse, sterilization methods that did not use cancer-causing EtO, including but not limited to, heat sterilization, nitrogen dioxide sterilization, and ionizing radiation, were available to Defendant, but Defendant chose to use EtO sterilization instead.

73.     As a proximate result of Defendant's willful and wanton acts or omissions, Plaintiff suffered injuries of a personal and pecuniary nature.

### COUNT III
**Private Nuisance**
**(On Behalf of Plaintiff and Against Defendant)**

74.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75.   The right of enjoyment of private property is an absolute right of every citizen.

76.   Defendant knew EtO to be hazardous and harmful to humans.

77.   Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of people living and working in the community.

78.   Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons breathing it.

79.   Defendant's operation, maintenance, and use of its sterilizing facilities caused those who live and work in the area surrounding its facilities to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

80.   Defendant's emissions of carcinogenic EtO interfere with Decedent's enjoyment of property and cause hurt, inconvenience, or damage to Decedent, including his ability to breathe air free of a carcinogenic toxin in the air on his property.

81.     As a proximate result of Defendant's operation, maintenance, and use of its sterilizing facility, Decedent's right to breathe clean air without dangerous levels of carcinogens, such as EtO, was eliminated and/or severely diminished.

82.     As a proximate result of Defendant's operation, maintenance, and use of its sterilizing facility, EtO continuously invaded and contaminated the areas surrounding Defendant's facility, including Decedent's residence.

83.     As a proximate result of Defendant's use and emission of EtO, Decedent was exposed to and inhaled significant amounts of EtO.

84.     As a proximate result of Defendant's use and emission of EtO, Decedent sustained severe and permanent damage to his health, including death, due to the emission of EtO.

85.     As a proximate result of Decedent's inhalation of EtO from Defendant's facility, Decedent suffered injuries of a personal and pecuniary nature.

## COUNT IV
### Ultrahazardous Activity/Strict Liability
### (On Behalf of Plaintiff and Against Defendant)

86.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

87.     Defendant's use, storage, and emission of EtO and EtO-sterilized products constitutes an ultrahazardous activity.

88.     Defendant's use, storage, and emission of EtO and EtO-sterilized products created a high degree of risk to those who live and work in the surrounding area. Even exercising reasonable care, this risk cannot be eliminated. Due to its chemical makeup, EtO will always be carcinogenic and dangerous, no matter what quantity is emitted. Unless EtO's chemical makeup is modified, and thus it is turned into a different compound, EtO will always be inherently dangerous.

89.     Medical device sterilization is not an activity carried out by many people in the population.

90.     Defendant's conduct is especially inappropriate given the densely populated, residential, and commercial area in which its facility is located, just around the corner from Decedent's home.

91.     The activities, as conducted by Defendant, are exceedingly dangerous and offer little to no value to the surrounding community.

92.     Because Defendant's activities are ultrahazardous, Defendant is strictly liable for any injuries proximately resulting therefrom.

93.     As a direct and proximate result of Defendant's ultrahazardous activities, Decedent was exposed to and inhaled great amounts of EtO.

94.     As a proximate result of Decedent's inhalation of EtO from Defendant's facility, Decedent suffered injuries of a personal and pecuniary nature.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter judgment in her favor and against Defendant as follows:

a.  An award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

b.  An award of punitive damages as allowed by law and in an amount to be determined;

c.  An award of attorneys' fees and costs and litigation expenses;

d.  An award of prejudgment interest on all amounts awarded;

e.  An Order for injunctive and declaratory relief; and

f.  Such other and further relief as this Court may deem just and proper.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**CLARA JORDAN, on behalf of decedent CHARLES JORDAN,**

Dated: December 9, 2021

By:/s/

*One of Plaintiff's Attorneys*

Charles C. Bailey
Georgia Bar No. 626778
charlie.bailey@cookconnelly.com

Sutton Connelly
Georgia Bar No. 940353
sutton.connelly@cookconnelly.com
**COOK & CONNELLY, LLC**
750 Piedmont Ave. NE
Atlanta, GA 30308
Tel: 678.539.0680

Benjamin H. Richman*
brichman@edelson.com
Michael Ovca*
movca@edelson.com
**EDELSON PC**
350 North LaSalle, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370

*pro hac vice* applications to be
submitted

*Attorneys for Plaintiff*